IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 18, 2020


**STATE OF TENNESSEE v. LACY LYNDON AUSTIN**


**Appeal from the Circuit Court for Montgomery County**
**Nos. 2016-CR-1533; 2017-CR-575     William R. Goodman III, Judge**

_____

**No. M2018-00591-CCA-R3-CD**

_____


The Defendant, Lacy Lyndon Austin, appeals his convictions for possession of methamphetamine with the intent to sell or deliver within 1,000 feet of a school zone, possession of a firearm during the commission of a dangerous felony, possession of a firearm by a person convicted of a felony drug offense and a felony involving the use of force or violence, simple possession of marijuana, and possession of drug paraphernalia. The Defendant argues that (1) the trial court erred by denying his motion to suppress the evidence seized as a result of a traffic stop; (2) the evidence was insufficient to support his convictions; and (3) the trial court abused its discretion by admitting a cell phone and photographs of text messages sent to the phone. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Wayne Clemons (on appeal); Zachary L. Talbot (at sentencing and motion for new trial); John D. Parker (at trial); and Jacob W. Fendley (at pretrial hearings),[1] Clarksville, Tennessee, for the appellant, Lacy Lyndon Austin.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and C. Daniel Brollier, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] In our discussion of the procedural posture of this case, we refer to the respective attorneys representing the Defendant in pretrial hearings and at trial. For clarity, "defense counsel" refers to Mr. Fendley, and "trial counsel" refers to Mr. Parker.

**OPINION**

FACTUAL BACKGROUND

On October 5, 2016, Montgomery County Sherriff's Deputy and 19th Judicial District Drug Task Force Deputy Daniel Gagnon conducted a traffic stop of the Defendant on Lafayette Road in Clarksville near Northwest High School. The Defendant was driving with a revoked license and had failed to stop completely before turning right at a red light. As a result of a search during the traffic stop, Deputy Gagnon found a quantity of methamphetamine concealed in a false-bottom can, a small amount of marijuana, and drug paraphernalia consistent with the resale of drugs; a handgun was also present in the car.

The May 2017[2] term of the Montgomery County Grand Jury charged the Defendant in Counts 1 and 2 with possession of twenty-six grams or more of methamphetamine with the intent to sell or deliver, respectively, within 1,000 feet of a school zone; in Count 3 possession of a firearm during the commission of a dangerous felony; in Count 4 with possession of a firearm by a person convicted of a felony drug offense; in Count 5 with possession of a firearm by a person convicted of a felony involving the use of force or violence; in Count 6 with simple possession of marijuana; and in Count 7 with possession of drug paraphernalia. See Tenn. Code Ann. §§ 39-17-408, -17-415, -17-418, -17-425, -17-434, -17-1307(b)(1)(A), (B), -17-1324(a). Thereafter, the Defendant filed a motion to suppress the evidence obtained during the search, alleging that Deputy Gagnon impermissibly prolonged and exceeded the scope of his initial stop by investigating the Defendant's passengers.[3]

*a. Suppression Hearing*

At the October 10, 2017 suppression hearing, Deputy Gagnon testified that he was previously acquainted with the Defendant and that he was aware that the Defendant was a convicted felon. Describing the events surrounding the traffic stop, Deputy Gagnon stated that on October 5, 2016, he was driving an unmarked police cruiser on Highway 374 when he noticed the Defendant driving a car on the same road. Deputy Gagnon recalled that the Defendant's driver's license had recently been revoked for unpaid criminal court costs, and

---

[2] The only indictment included in the appellate record relates to case number 2017-CR-575. Discussion in one of the pretrial hearing transcripts reflects that the Defendant was originally charged in case number 2016-CR-1533 and that the State obtained a superseding indictment in order to add the school zone enhancement language to Counts 1 and 2.

[3] The motion to suppress, the State's response, and any written order by the trial court are not included in the appellate record. However, the arguments of defense counsel and the State at the suppression hearing and the trial court's oral findings of fact and conclusions of law are sufficient for this court to address the Defendant's suppression issues.

he began to follow the Defendant. Deputy Gagnon called another deputy to verify the status of the Defendant's license; upon receiving confirmation that it had been revoked, Deputy Gagnon continued to follow the Defendant and "waited for him to commit a traffic infraction." Deputy Gagnon explained it was simpler, in his opinion, to justify a traffic stop based upon a traffic offense rather than having to explain the basis of his knowledge that the Defendant's license had been revoked.

Deputy Gagnon testified that the Defendant subsequently turned right at the intersection of Highway 374 and Lafayette Road; although the traffic signal was red, the Defendant did not come to a complete stop before turning. Deputy Gagnon was directly behind the Defendant's car, and he subsequently activated his blue lights after turning right onto Lafayette Road. The Defendant pulled into a residential driveway on the 800 block of Lafayette Road. Deputy Gagnon agreed that based upon his previous experience with the Defendant, drug possession was "a thought in the back of [his] mind," but he stated that he "really" wanted to stop the Defendant for driving with a revoked license.

Deputy Gagnon testified that a male passenger sat in the passenger-side back seat, and a female passenger sat in the front passenger seat. Deputy Gagnon stated that the male passenger was moving around more than usual; as a result, Deputy Gagnon called for backup. Deputy Gagnon walked to the car and asked the Defendant for his license and insurance. Deputy Gagnon told the Defendant that he failed to stop at the red light. When asked whether he was aware that his license had been revoked, the Defendant responded negatively.

Deputy Gagnon asked the passengers for their names; the female passenger identified herself as Heather Brown, and the male passenger identified himself as Jason McCarty.[4] Neither passenger had an identification card, and Deputy Gagnon asked both of them to write down their names, dates of birth, and social security numbers in order to verify their identities and whether "they had valid licenses[.]" Deputy Gagnon noted that Ms. Brown hesitated for several seconds before writing down her information, which "raised a red flag[.]" After Mr. McCarty wrote down his information, Deputy Gagnon asked the Defendant to exit the car.

Deputy Gagnon testified that the Defendant gave consent for a pat-down search and for Deputy Gagnon to search his pockets; although the Defendant had no weapons, Deputy Gagnon found a "large sum" of cash. The Defendant told Deputy Gagnon that he was driving from Dover, Tennessee, to a car dealership in Clarksville. At this point, a Clarksville police officer arrived, and Deputy Gagnon asked him to stay with the Defendant. Deputy Gagnon returned to the front passenger window to speak to Ms. Brown

---

[4] The suppression hearing transcript refers to "Jason McCardy"; however, the record reflects that McCarty is the correct spelling.

because he had a "suspicion" that she had given him false information due to her previous hesitation. Deputy Gagnon noted that Mr. McCarty again "began moving around furtively" by moving side to side and placing his hands out of Deputy Gagnon's view. Deputy Gagnon asked Mr. McCarty to place his hands on the back of the front passenger headrest and inquired with both passengers about their destination. Ms. Brown stated that they were going to her father's house, and Mr. McCarty simultaneously said that they were going to a friend's house. Based upon their inconsistent answers, Deputy Gagnon asked Ms. Brown to exit the car.

When Ms. Brown stood up, Deputy Gagnon saw that she had been sitting on a digital scale with "a crystalline substance on it" and a plastic bag containing several smaller bags. Deputy Gagnon searched Ms. Brown and asked Mr. McCarty to exit the car. During a pat-down search for weapons, Deputy Gagnon felt an object in Mr. McCarty's "groin region" and shook his pant leg, upon which a glass methamphetamine pipe fell out and broke on the ground. Deputy Gagnon placed Mr. McCarty and Ms. Brown under arrest.

Deputy Gagnon then returned to the Defendant and asked if the car contained any narcotics or firearms; the Defendant responded that there was a handgun in the driver's side floorboard. When told that he was not permitted to possess a firearm, the Defendant stated that he understood and that the gun belonged to his sister. Deputy Gagnon arrested the Defendant; after a more thorough search of the car, Deputy Gagnon found a false-bottom can containing two plastic bags of methamphetamine in the back seat behind the center console.

Deputy Gagnon estimated that eight or nine minutes passed between the time he stopped the Defendant and the Defendant's arrest. The police dispatch log reflected that Deputy Gagnon reported at 4:38 p.m. that he was going to initiate the traffic stop and that he reported at 4:50 p.m. that he had arrested the Defendant and Mr. McCarty.

Deputy Gagnon testified that after he informed the trio of their rights, Ms. Brown and Mr. McCarty spoke to him, and the Defendant declined to make a statement. Ms. Brown and Mr. McCarty both admitted to knowing that a "little bit" of methamphetamine was in the car. Ms. Brown stated that the methamphetamine belonged to the Defendant, and Mr. McCarty said that he did not realize that the car contained such a large quantity of methamphetamine. When Deputy Gagnon brought the Defendant to "the Magistrate's window," the Defendant "blurt[ed]" out that he could help the police "get one of the biggest dealers in Clarksville," but that if his photograph appeared in the booking report, "they" would see it, after which the Defendant could not "do anything for" the police.

On cross-examination, Deputy Gagnon testified that at the time of the October 2016 traffic stop, he knew that the Defendant was serving an eight-year community corrections sentence in connection with a previous case involving prescription pills. Deputy Gagnon

-4-

noted that he kept himself apprised of the outcome of cases in which he was involved, including whether the defendants had been placed on probation. Deputy Gagnon also routinely "check[ed] driver's licenses" to determine where defendants were living "and things of that nature."

Deputy Gagnon testified that although he did not decide to arrest the Defendant before initiating the traffic stop, he was "pretty sure" he would arrest the Defendant because the Defendant was serving an alternative sentence; as a result, the Defendant "was more than likely going to jail" for driving with a revoked license. When asked how long he waited after turning onto Lafayette Road before activating his blue lights, Deputy Gagnon stated that after turning, he called police dispatch to inform them of his location and that he was making a stop. He estimated that on Lafayette Road, the distance between the Highway 374 intersection and the next major intersection at North Liberty Church Road was about one-quarter of one mile.

Deputy Gagnon testified that he routinely asked drivers with revoked licenses to exit their cars because they could not legally continue to drive. He agreed that the Defendant did not appear to be armed and that he was not making "suspicious movements." Deputy Gagnon acknowledged that none of his questions to the Defendant or the passengers related to running the red light and that after the initial discussion of the Defendant's driver's license, he did not mention it.

Deputy Gagnon testified that all three occupants of the car were breathing rapidly when he asked the Defendant for his license. Deputy Gagnon denied that he asked Ms. Brown and Mr. McCarty to exit the car in the hope of seeing "more things, maybe contraband and things like that[.]" He acknowledged that his primary job was related to narcotics investigation; he denied, however, that he was looking for drugs after he initially spoke to the Defendant. Deputy Gagnon stated that he investigated Ms. Brown because he "believed she wasn't telling [him] the truth [about] who she was," which was a crime. He agreed that he told Ms. Brown that he would not charge her with giving a false identity.

Deputy Gagnon testified that he searched Ms. Brown's "immediate area" in the car and found a bag containing about six grams of marijuana in a grocery bag "wedged in between the passenger seat and center console." Deputy Gagnon stated that he found the false-bottom can underneath the front passenger seat and partially protruding into the passenger back seat floorboard. He agreed that the can was within Mr. McCarty's reach and in the same area into which Mr. McCarty had been bending. Deputy Gagnon further agreed that the items in Ms. Brown's vicinity were under her control. Deputy Gagnon stated that he did not field test the residue on the scale.

The Defendant argued that Deputy Gagnon impermissibly started "another investigation" that "abandoned" the original purpose of the traffic stop when he "pull[ed]

-5-

folks out of the car." The Defendant argued that nervous behavior and a previous drug-related criminal history were not alone sufficient to provide reasonable suspicion of criminal activity such that a search of a vehicle was permissible, citing State v. Joshua Caleb Simmons, No. M2008-00107-CCA-R3-CD, 2009 WL 2391403, at *6 (Tenn. Crim. App. Aug. 5, 2009). The Defendant contended that the traffic stop was impermissibly prolonged and became unreasonable when Deputy Gagnon "start[ed] going through people's pockets and seizing their money." The Defendant argued that his liberty was "substantially compromised" and that Deputy Gagnon did not have a legitimate reason to search the vehicle incident to an arrest. The Defendant argued that Deputy Gagnon's reason for stopping the Defendant was pretextual in light of his true intent to search the Defendant's car for drugs.

The State responded that Deputy Gagnon had probable cause to arrest the Defendant at the time he verified that the Defendant was driving with a revoked license. The State averred that it was reasonable for Deputy Gagnon to do "a little bit of additional investigation" before deciding whether to arrest the Defendant. The State characterized Deputy Gagnon's actions as "designed not to be oppressive towards [the Defendant] or the other individuals there."

The trial court noted that "so long as the stop ha[d] legitimate underpinnings . . . it [did not] make any difference that it [was] a pretextual stop[.]" The court noted that a driver should expect to spend a short period of time answering questions and waiting while an officer checks his license and registration and that this general procedure was followed in the Defendant's case. The court found that it was reasonable for Deputy Gagnon to have asked Ms. Brown and Mr. McCarty to exit the car. The court further found that probable cause for the Defendant's arrest arose from his possessing a gun in the car as a convicted felon. The court denied the motion to suppress.

### b. Trial

Before the trial began, the trial court bifurcated the proceedings by agreement of the parties. Counts 4 and 5 relative to possession of a firearm by a convicted felon were considered after the return of the verdict relative to Counts 1-3 and 6-7.[5]

Deputy Gagnon testified consistently with his suppression hearing testimony, except he identified Ms. Brown as "Christina Brown"[6] and stated that Mr. McCarty

---

[5] Counts 4 and 5 were renumbered as Counts 6 and 7 for purposes of the bifurcated jury deliberations; the jury was presented with the original Counts 6 and 7, simple possession of marijuana and possession of drug paraphernalia, as Counts 4 and 5. The judgment forms reflect the original numbering from the indictment.

[6] On cross-examination, Deputy Gagnon clarified that Ms. Brown had given him a false first name when she identified herself as Heather Brown.

produced identification upon request. Deputy Gagnon added that when he encountered the Defendant, Ms. Brown, and Mr. McCarty, they were all breathing rapidly and looked extremely nervous; he commented that although some level of nervousness was typical during a police encounter, normal people did not exhibit "signs of extreme nervousness" such as "carotid arteries . . . pulsating out of their neck[s]" or shaking hands and arms. Deputy Gagnon noted that the Defendant had about $1,471 in cash inside his pockets.

Deputy Gagnon testified that when Ms. Brown exited the car, he saw a grocery bag containing a green plant material resembling marijuana, as well as the digital scale and plastic bags. Deputy Gagnon identified photographs of items found in the Defendant's car, including the drug-related items and two cell phones. He stated that in his experience, drug sellers commonly carried digital scales and drug users did not. Deputy Gagnon said that one of the cell phones came from Ms. Brown's person or her purse, and the other cell phone was found in the car's center console. Deputy Gagnon obtained search warrants for both cell phones.

At this point, the Defendant objected to the admission of the cell phone from the center console as an exhibit, arguing that no foundation had been laid to establish that the phone belonged to him. Upon further examination by the State, Deputy Gagnon testified that he determined that the phone belonged to the Defendant by reading the text messages contained therein. He explained that the phone contained text messages sent from a contact labeled with Mr. McCarty's name, which excluded Mr. McCarty as the owner. Similarly, some of the incoming text messages addressed the intended recipient using gendered language such as "dude, bro, [and] man," which excluded Ms. Brown as the owner. Deputy Gagnon noted that the cell phone recovered from Ms. Brown contained messages referencing the phone's owner as "Christina," indicating that it belonged to her. Deputy Gagnon did not recall whether any of the text messages on the Defendant's cell phone referred to him by name.

The Defendant renewed his objection, and the trial court found that because Deputy Gagnon testified that he saw the cell phone in the car, it would admit the phone as an exhibit. The court noted that it would "remain then as to whose phone it [was.]"

Deputy Gagnon testified that in Ms. Brown's seat, he found two large plastic bags containing eighteen smaller bags each, for a total of thirty-six small plastic bags. He noted that in his experience, narcotics were packaged for sale in similar bags. Deputy Gagnon stated that he recovered the handgun, which was loaded, from the driver's seat floorboard; he also found unfired bullets loose in the car, as well as in a plastic ammunition holder.

Deputy Gagnon testified that in addition to the methamphetamine pipe from Mr. McCarty's pants, he found a methamphetamine pipe in Ms. Brown's purse. Deputy Gagnon agreed that unlike Ms. Brown and Mr. McCarty, the Defendant possessed no drug

paraphernalia consistent with his using methamphetamine. He stated that the leafy substance from the passenger seat field tested positive for marijuana and that the substance from the false-bottom can field tested positive for methamphetamine. He noted that the methamphetamine from the can was packaged in two separate plastic bags, which weighed about twenty-nine and twenty-seven grams, respectively.

Deputy Gagnon testified that methamphetamine was typically sold in several standard quantities, including one gram, an "eight-ball," which was three and one-half grams, a quarter ounce or "quarter," and a "half ounce." Deputy Gagnon noted that a "zip" was a quantitative term used to refer to one ounce of any of several types of illegal drugs, including methamphetamine, marijuana, cocaine, or heroin. He said that although $1,100 per ounce was "kind of expensive" for methamphetamine, it was still within a normal price range. Deputy Gagnon stated that in his experience, if fifty-six grams of methamphetamine were sold in one-gram increments, it was worth about $5,600.

Deputy Gagnon identified several photographs of text messages recovered from the cell phone found in the center console. The Defendant objected and argued that the State had still not established that the phone belonged to the Defendant. The trial court found that the identity of the phone's owner was a jury question, which could be established by circumstantial evidence, and it overruled the objection.

Photographs of text messages[7] were received as exhibits and reflected the following:

| To | From | Date/Time | Message |
|---|---|---|---|
| | "Jason Mcarty" | 10/04/2016 10:26 p.m. | "Il buy 2 zips for 2000 a friend wants it yes or no nd to knw so I cn tel hm make happen bro" |
| | Jason Mcarty | 10/04/2016 11:40 p.m. | "I justtexted them told them ur right 50 more I only utrying help" |
| | Jason Mcarty | 10/05/2016 2:35 a.m. | "I can mv more imorning but get quarter knw if you want to i can" |
| | Jason Mcarty | 10/05/2016 | "K i nd a hf how much other in morning" |

[7] The text messages contained multiple spelling errors and abbreviations. So as not to change their meaning, we have not corrected the messages.

| | | 2:37 a.m. | |
|---|---|---|---|
| Jason Mcarty | | 10/05/2016 2:38 a.m. | "650 4 a 1/2" |
| | "Jimbob Thornton" | 10/05/2016 7:45 a.m. | "Yo zip" |
| | Jimbob Thornton | 10/05/2016 7:48 a.m. | "Need a w zip for eleven hun im serious" |
| Jimbob Thornton | | 10/05/2016 8:46 a.m. | "K hv it" |
| Jimbob Thornton | | 10/05/2016 8:47 a.m. | "1200" |
| Jason Mcarty | | 10/05/2016 2:01 p.m. | "Twenty two for two" |
| | Jason Mcarty | 10/05/2016 2:24 p.m. | "22 hndrd for 2 zips that what u sayin sor bro lot onmind gues that b---ch f---ing revoked my bond gxes bulsht trying set me up get me busted if gother get stuf hav me arrested got orrder protection on me bvlsht hows that work mis covrtdate reschedul it caus went rehab thought that was ptting my self in state custity then knw clinme f--kf bro il try m that holdon let me try dov they nd knw" |
| "Wayne Powel St" | | 10/05/2016 2:57 p.m. | "I need another n an hr" |

| | Jason Mcarty | 10/05/2016<br><br>3:45 p.m. | "Dude with nic sold quarter for 400 for u" |
|---|---|---|---|
| Wayne Powel St | | 10/05/2016<br><br>4:13 p.m. | "Need four now" |
| Wayne Powel St | | 10/05/2016<br>4:33 p.m. | "I need four" |
| | "Lola" | 10/05/2016<br><br>Time not shown | "I'm wrking no time for silly s--t ok watch ur self she has robbed ppl b for I'd hate for her to rob u.  And hurt u I'm for real lynn" |

The Defendant objected to the text messages sent from Jimbob Thornton as inadmissible hearsay; the State responded that the messages were "indicative of drug transactions that [were] ongoing" and that they were found on a cell phone in the Defendant's "immediate vicinity."  The trial court found that the messages were admissible "[f]or that limited purpose" and overruled the objection.  The court noted for the record the Defendant's hearsay-based objection to the remainder of the incoming messages.

Deputy Gagnon testified that the message to Mr. McCarty about "650 for a half" was reciting the price of one half-ounce of methamphetamine; he noted that the price was too high to have referred to marijuana.  Deputy Gagnon said that the message from Mr. McCarty about a man named Nick referred to selling one quarter-ounce of methamphetamine for $400, which was a standard price.

Deputy Gagnon testified that the traffic stop occurred about 349 feet from Northwest High School.  He stated that when the Defendant arrived at the police station, he told Deputy Gagnon that if he did not "book [the Defendant] in" the system, the Defendant could help Deputy Gagnon "make an extremely large federal case."  The Defendant also told Deputy Gagnon that if the Defendant's photograph appeared in the booking log, the "big time . . . dealers" would not "mess with" the Defendant anymore.

On cross-examination, Deputy Gagnon acknowledged that he could have initiated the traffic stop upon seeing the Defendant or immediately upon the Defendant's rolling through the red light.  Deputy Gagnon noted that he called dispatch to notify them of the

stop before he activated his blue lights around "Gliddon" Drive.[8] He acknowledged that his police report stated that he activated his lights at the intersection of Lafayette Road and North Liberty Church Road.[9] When asked why he waited to pull over the Defendant until they had almost reached the school, Deputy Gagnon repeated that he anticipated having to argue a suppression issue in court and that he "waited for a traffic infraction" to avoid having to explain the basis for his knowledge of the Defendant's prior license revocation. Relative to the location of the traffic stop, Deputy Gagnon explained that he continued driving as he turned onto Lafayette Road, called dispatch, received a response, and activated his blue lights.

Deputy Gagnon testified that he had "no idea" whether the Defendant intended to sell the methamphetamine inside the school zone, and he explained for the jury the circumstances in which the school zone enhancement applied to drug offenses. Deputy Gagnon agreed that the Defendant was compliant during the traffic stop. Deputy Gagnon stated that Ms. Brown gave him a false name because she had an outstanding arrest warrant. He said that when he opened the false-bottom can, Ms. Brown began to cry and told Deputy Gagnon that she knew the can contained methamphetamine and that her fingerprints would be on the can. Deputy Gagnon did not know whether the can was tested for fingerprints. Deputy Gagnon agreed that the car belonged to the Defendant and that no other drugs were found aside from the marijuana and the methamphetamine in the can. Deputy Gagnon acknowledged that he was not "100 percent" certain that the cell phone from the center console belonged to the Defendant; however, he stated that in his "professional and personal opinion," he believed the phone was the Defendant's. Deputy Gagnon further acknowledged that he found evidence of prescription pill sales on Ms. Brown's cell phone and that it was common for a drug dealer to possess more than one cell phone.

Tennessee Bureau of Investigation forensic chemist Rebecca Hernandez, an expert in drug identification, testified that she analyzed the leafy substance and one large bag of white material from the Defendant's car, which she identified as 5.29 grams of marijuana and 27.90 grams of methamphetamine, respectively. Agent Hernandez noted that she did not test the second bag of suspected methamphetamine because the weight of the first bag of methamphetamine exceeded 26 grams, which was relevant to the felony class charged, but the combined weight of both bags did not come close to exceeding 300 grams, the next weight-related felony class threshold.

Jason McCarty testified that he had known the Defendant for fifteen years and that he pled guilty to possession of methamphetamine related to the October 5, 2016 traffic

---

[8] The map in the record reflects that the road to which Deputy Gagnon referred was Glennon Drive.

[9] The map exhibit reflected that the North Liberty Church Road intersection was closer to the school than the Glennon Drive intersection.

stop. Mr. McCarty denied owning the methamphetamine and the gun in the Defendant's car, and he stated that he did not know to whom either item belonged. When asked about the incoming text messages on the Defendant's cell phone that were attributed to him, Mr. McCarty said that he believed another person sent the messages from his cell phone. He explained that after he was incarcerated in connection with a previous criminal case, his cell phone "was being used by somebody else" after being "stolen or something." Mr. McCarty said that he subsequently went to drug rehabilitation and that within a day or two of his release, he "got in the car with [the Defendant]" and they "got in trouble." He claimed that his cell phone was "gone" and that he did not have a cell phone in the Defendant's car. Mr. McCarty noted that he had been "having a rough time."

On cross-examination, Mr. McCarty testified that during the traffic stop, he was nervous, breathing heavily, and moving around in an attempt to hide the methamphetamine pipe and a marijuana cigarette. He noted that he was a drug user as opposed to "a big time man." Mr. McCarty affirmed that he had recently smoked methamphetamine at the time of the traffic stop, and he said that on that day, he anticipated that the group was "going to smoke or do something like that." Mr. McCarty stated that he "probably" would not have gotten into the Defendant's car if he knew it contained "a bunch [of] drugs[.]" Mr. McCarty averred both that he lacked any knowledge of the presence of methamphetamine in the car and also that he "thought maybe [they] had, like, a gram or something[.]" When asked to clarify whether he knew methamphetamine was in the car, Mr. McCarty said,

> I mean, not really. I mean . . . nobody just whipped out meth. But, I mean, I figured that's what we would do. We have smoked meth together.
>
> . . . .
>
> . . . I figured we had a little dope on us. I had a meth pipe. I might have had a little bit on me that I would put in the pipe. I mean, that's all I had was a pipe and a joint on me, so I really didn't have any meth, at the time.

Mr. McCarty maintained that he did not know to whom the methamphetamine in the can belonged. He stated that he pled guilty in order to avoid being in jail for "long, long, long periods of time and still get charged with it[.]" He stated that by pleading guilty, he admitted only that he was "in the wrong place at the wrong time[.]" He noted that he had been in jail for 135 days at the time he entered his guilty plea and that he had also "just served two years in Dover" for a violation of probation. Mr. McCarty agreed that pursuant to his plea agreement, he received eight years' probation in this case; he further agreed that if he did not testify against the Defendant, his probation could be revoked.

Relative to his cell phone, Mr. McCarty testified that he had been incarcerated for seven months prior to the traffic stop and that during his confinement, he heard that his phone was being used by other people. He hypothesized that his cell phone was taken from a house in which he lived before he went to prison. Mr. McCarty stated that on the day of the traffic stop, the Defendant was going to help him buy tires for Mr. McCarty's sister-in-law and that they also planned to go to a hotel and "hang out or something" with "that girl." Mr. McCarty thought that he told Deputy Gagnon about the plan to buy tires.

Mr. McCarty testified that although the stipulated facts underlying his plea included that the gun in the car belonged to the Defendant, he refused to "sit here and say that it was his gun or not[.]" Mr. McCarty affirmed that the gun was in the Defendant's car under the driver's seat. However, Mr. McCarty stated that he did not initially know a gun was in the car and that the Defendant "just didn't willingly show" Mr. McCarty a gun. Mr. McCarty denied having fired the gun on a previous occasion and almost shooting himself.

Mr. McCarty averred that his testimony was truthful and that he was "a man" who would "take [his] charges" and admit the gun was his if that were the case. Mr. McCarty swore "to God, on Jesus' mother" that the gun and methamphetamine were not his.

Christina Brown testified that at the time of the trial, she was incarcerated for violating a previous probationary sentence, as well as for unspecified charges related to the October 5, 2016 traffic stop. Relative to the charges arising from the traffic stop, Ms. Brown pled guilty to possession of drug paraphernalia and "all the other charges" were dismissed contingent on her trial testimony against the Defendant. Ms. Brown acknowledged that she had prior convictions for aggravated burglary, theft of property, and shoplifting. She stated that on October 5, 2016, the Defendant picked her up from her father's house; when they stopped at a store, Ms. Brown saw the Defendant remove a gun from under a seat and place it in his pants. Ms. Brown said that they later picked up Mr. McCarty at his home. Ms. Brown stated that she owned a Verizon "smartphone" and that the Defendant had a "flip-phone." She identified both cell phones as the ones introduced as exhibits.

Ms. Brown testified that at some point, the Defendant asked her to find the false-bottom can, which had rolled around in the back seat. Ms. Brown eventually located it underneath the front passenger seat, and she agreed that her fingerprints would have been present on the can. She stated that she saw a digital scale in the center console. Ms. Brown acknowledged that when she exited the car during the traffic stop, she was sitting on empty plastic bags and a grocery bag containing marijuana.

On cross-examination, Ms. Brown admitted that she lied to Deputy Gagnon by giving a false name because she had an active arrest warrant on file. She acknowledged telling Deputy Gagnon that they were traveling to her father's house. She denied owning

-13-

the plastic bags, digital scale, and marijuana. Ms. Brown stated that the car contained "a lot of stuff" and that she did not pay attention to the items on which she sat. When asked whether she had any idea that she was sitting on drugs, Ms. Brown stated that she "might have been under the influence" at the time. Ms. Brown affirmed that the methamphetamine pipe in her purse was hers and that she had recently used it.

Ms. Brown testified that when Deputy Gagnon opened the false-bottom can and removed the bags of methamphetamine, she began to cry because she was "freaking out" and "was like, oh, my God." She denied knowing that methamphetamine was inside the can or in the car; however, she acknowledged telling Deputy Gagnon that she knew or assumed that methamphetamine was "probably" in the car. Ms. Brown admitted her methamphetamine use to Deputy Gagnon, and she agreed that a search of her cell phone revealed evidence of drug sales.

Ms. Brown acknowledged that after she testified against the Defendant, any charges related to her incriminating statements and the drug selling activity documented on her cell phone would be dismissed pursuant to her plea agreement. Ms. Brown agreed that she was released on a one-year probationary sentence after entering her plea and that she was motivated to accept the plea offer in order to obtain her "freedom." Ms. Brown stated that after two months on probation, her probation was revoked for leaving town to attend drug rehabilitation without notifying her probation officer and for failing a drug screen and testing positive for methamphetamine. Ms. Brown acknowledged that in March 2018, she incurred additional criminal charges and pled guilty to theft.

Upon this evidence, the Defendant was convicted as charged in Counts 1 through 5. The State then entered as exhibits certified copies of judgments related to the Defendant's prior convictions. On December 10, 1996, the Defendant pled guilty in Montgomery County Criminal Court case number 36938 to possession of marijuana with the intent to resell. On February 27, 1989, the Defendant pled guilty in Montgomery County Criminal Court case number 25636 to aggravated assault. Upon this additional evidence, the Defendant was convicted as charged in Counts 6 and 7.

The Defendant filed a pro se notice of appeal on April 5, 2018, before his sentencing hearing occurred; this court entered a May 2, 2018 order in which we treated the pro se notice of appeal as prematurely filed, noted that appellate counsel had been appointed, and held the matter in abeyance until the conclusion of the relevant trial court proceedings. See Tenn. R. App. P. 4(d) ("A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof"). After

-14-

an August 16, 2018 sentencing hearing, the trial court merged the convictions in Counts 1 and 2 and Counts 6 and 7, respectively, and imposed an effective forty-two-year sentence.[10]

## ANALYSIS

On appeal, the Defendant contends that (1) the trial court erred by denying his motion to suppress the evidence seized during the traffic stop; (2) the evidence was insufficient to support his convictions; and (3) the trial court abused its discretion by admitting the cell phone and the photographs of the Defendant's text messages. We will consider each issue in turn.

### I.    *Suppression*

The Defendant contends that the trial court erred by denying his motion to suppress, arguing that Deputy Gagnon "exceed[ed] the manner of his investigation" by choosing not to initiate the traffic stop until the Defendant committed a second traffic infraction by rolling through the red light. Although the Defendant does not explicitly allege that Deputy Gagnon purposefully waited to stop the Defendant until he had entered a school zone, the Defendant intimates that Deputy Gagnon, who had "multiple years of drug enforcement experience . . . was likely to know" of the school zone enhancement. The State responds that this issue has been waived for failure to provide an adequate appellate record; in the alternative, the State argues both that Deputy Gagnon was not required to stop the Defendant immediately and that Deputy Gagnon's testimony did not reflect that he based his actions before the traffic stop upon "a desire to obtain the school zone enhancement."

In a related issue, the Defendant contends that the evidence should have been suppressed because Deputy Gagnon exceeded the scope of the traffic stop when he returned to the Defendant's car to question Ms. Brown and Mr. McCarty. The Defendant submits that after improperly expanding the scope of his investigation, Deputy Gagnon further engaged in an "unreasonable removal" of Ms. Brown from the car based upon her giving a false name, the passengers' inconsistent descriptions of their destination, and Mr. McCarty's furtive movements. The State responds that Deputy Gagnon was constitutionally entitled to ask Ms. Brown for her identification and to exit the car based upon the passengers' suspicious behavior.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and

---

[10] The Defendant does not raise any issues related to sentencing on appeal.

value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Conversely, a trial court's conclusions of law, along with its application of the law to the facts, are reviewed de novo without any presumption of correctness. Id.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches [or seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007).

"Individuals do not lose their constitutional protections against unreasonable searches and seizures by getting into an automobile." State v. Smith, 484 S.W.3d 393, 400 (Tenn. 2016). However, if the officer has probable cause or a reasonable suspicion to suspect that a motorist has committed a traffic offense, a traffic stop will "pass constitutional muster." Id. at 400-02.

In this case, the propriety of the stop is not at issue; it is undisputed that the Defendant had a revoked driver's license and turned right at a red light without stopping, which provided Deputy Gagnon with probable cause to initiate a traffic stop. We note that Deputy Gagnon's subjective motivations in stopping the Defendant are immaterial given that probable cause supported the traffic stop. See State v. Brown, 294 S.W.3d 553, 562 (Tenn. 2009) (citing Whren v. United States, 517 U.S. 806, 810 (1996); State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997)).

Instead, the Defendant's issues relate to the well-established principle that "the duration of an investigative detention," including a traffic stop, "should last no longer than necessary and should generally end when there is no further reason to control the scene or the driver of the vehicle." State v. Donaldson, 380 S.W.3d 86, 93 (Tenn. 2012) (citing Arizona v. Johnson, 555 U.S. 323, 333 (2009)). "The proper inquiry is whether, during the detention, the officer diligently pursued a means of investigation that was likely to confirm or dispel suspicion quickly." Brown, 294 S.W.3d at 562 (citing State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998)). A reasonable traffic stop can become unreasonable "if the time, manner or scope of the investigation exceeds the proper parameters." State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (internal citations omitted).

-16-

*a. Manner of Investigation Before Traffic Stop*

As the State observes, the appellate record does not contain the Defendant's motion to suppress or the trial court's written order denying the motion. Similarly, the written motion for a new trial raises a general suppression issue without specifying the grounds upon which the evidence should have been suppressed, and the motion for a new trial hearing transcript is not included in the record. The trial court's written order denying the motion for a new trial does not include its findings of fact or conclusions of law.

The suppression hearing transcript reflects that the only issue defense counsel argued was the propriety of Deputy Gagnon's questioning the passengers.[11] As a result, it is unclear whether that the Defendant raised the pre-stop delay issue at any point prior to the instant appeal, and this issue has been waived. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). We note that the Defendant bears the burden of preparing an adequate record on appeal, including transcripts of all parts of the proceedings "necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b); see Timothy A. Baxter v. State, No. W2019-00590-CCA-R3-CD, 2020 WL 41926, at *2 (Tenn. Crim. App. Jan. 3, 2020) (citing State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993)). The Defendant is not entitled to relief on this basis.

*b. Investigation of Passengers*

Relative to Deputy Gagnon's asking Ms. Brown and Mr. McCarty for identification, this court has previously concluded that an officer may not enter a car to investigate passengers during a traffic stop based upon "curiosity" alone without any additional cause for suspicion. See Johnson v. State, 601 S.W.2d 326, 328-29 (Tenn. Crim. App. 1980). However, in the years since Johnson was decided, this court has repeatedly declined to expand its ruling beyond its particular facts. See, e.g., State v. Kevin M. Frierson, No. M2009-01544-CCA-R3-CD, 2010 WL 5140674, at *5 (Tenn. Crim. App. Dec. 14, 2010) (distinguishing that case from Johnson by discussing the passenger's suspicious behavior); State v. Thomas Dewayne Moffatt, No. W2008-01048-CCA-R3-CD, 2009 WL 1643432, at *5 (Tenn. Crim. App. June 12, 2009) (distinguishing that case from Johnson by discussing the driver's suspicious behavior, namely "pulling his shirt down as if to conceal something near his waist" and failing to respond to the officer's asking if he had a weapon); State v. Juan La Sean Perry, No. M2007-00903-CCA-R3-CD, 2008 WL 1875165, at *5

---

[11] Although Deputy Gagnon's delay in initiating the traffic stop was discussed during cross-examination, counsel did not argue it as a distinct issue.

(Tenn. Crim. App. Apr. 28, 2008) (distinguishing that case from Johnson by discussing the driver's "acting funny" and evading the officer's questions, as well as giving a different name for a passenger than the passenger gave).

The Defendant's case is analogous to Frierson, in which this court concluded that it was constitutionally permissible for an officer to ask a passenger for identification during a traffic stop when the officer observed the passenger's moving furtively. See 2010 WL 5140674, at *5. Deputy Gagnon testified that when he approached the Defendant's car, Mr. McCarty was moving around in the backseat in a furtive manner. Deputy Gagnon noted that the level of movement was higher than normal and that both Mr. McCarty and Ms. Brown acted nervously. All three of the car's occupants were breathing heavily, and Deputy Gagnon distinguished their appearance from the typical participant in a traffic stop by stating that normally, people's hands and arms did not shake and their carotid arteries were not visibly pulsating. Based upon these observations, Deputy Gagnon asked the passengers for identification. The trial court did not err by finding that his actions were constitutionally permissible in this regard.

Relative to Ms. Brown's removal from the car, our supreme court has previously held that during a traffic stop, an officer may routinely ask a driver to exit his vehicle for a short period of time while the officer conducts an otherwise constitutionally compliant investigation to confirm or dispel the officer's suspicions related to the cause of the stop. Donaldson, 380 S.W.3d at 93-94 (adopting the rule announced in Pennsylvania v. Mimms, 434 U.S. 106 (1977)). Subsequently, the United States Supreme Court extended its holding in Mimms to a police officer's ordering a passenger to exit a car during a traffic stop. Maryland v. Wilson, 519 U.S. 408, 410-11 (1997). In that case, the officer observed the passengers' looking backward toward his police cruiser and ducking out of sight; the driver was trembling and acting "extremely nervous"; and the defendant, who was the front seat passenger, was sweating and also acting very nervously. Id. This court has applied Wilson's holding to Tennessee cases using our supreme court's guidance in Donaldson that "in the context of traffic stops, the protections afforded by article I, section 7 of the Tennessee Constitution [are] coextensive with the protections afforded by the Fourth Amendment." State v. Jerry Lee Joyner, No. W2019-00106-CCA-R3-CD, 2020 WL 413373, at *9 (Tenn. Crim. App. Jan. 24, 2020) (quoting Donaldson, 380 S.W.3d at 92).

The Defendant's case is factually similar to Wilson; in addition to Mr. McCarty's furtive movements and the nervous appearance of all of the car's occupants, Ms. Brown hesitated before writing down her information, raising suspicions regarding her identity. At this point, Deputy Gagnon asked the Defendant to exit the car and questioned him separately, during which time a backup officer arrived. Once the Defendant was supervised, Deputy Gagnon walked to the front of the car and asked Ms. Brown and Mr. McCarty brief, general questions. Mr. McCarty continued moving around to such a degree

that Deputy Gagnon had to ask him to place his hands on the passenger seat in front of him. Upon receiving inconsistent answers about their destination, Deputy Gagnon had observed ample suspicious behavior to constitutionally permit him to ask Ms. Brown to step out of the car. The trial court did not err by declining the motion to suppress on this basis, and the Defendant is not entitled to relief.

## II. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to support his convictions, arguing that (1) the State failed to establish that the Defendant constructively possessed methamphetamine; (2) Ms. Brown and Mr. McCarty were "compromised" because they testified pursuant to plea agreements, and (3) Ms. Brown and Mr. McCarty were not credible because they were both intoxicated during the traffic stop. The State responds that the evidence is sufficient.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Our criminal statutes provide that it is an offense to knowingly sell or deliver a controlled substance. Tenn. Code Ann. § 39-17-417(a)(2) & (3). "[A] person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn.

Code Ann. § 39-11-302(b). "Possession may be actual or constructive." State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981). Constructive possession occurs when a person knowingly has the "power and the intention at a given time to exercise dominion and control over an object, either directly or through others." Id. (quoting United States v. Craig, 522 F.2d 29 (6th Cir. 1975)). The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs. State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987) (citations omitted). However, as stated above, circumstantial evidence alone may be sufficient to support a conviction. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). Further, it is permissible for the jury to draw an inference of intent to sell or deliver when the amount of the controlled substance and other relevant facts surrounding the arrest are considered together. Tenn. Code Ann. § 39-17-419.

Relative to the proof of constructive possession, in the light most favorable to the State, a false-bottom can containing a substantial amount of methamphetamine was found wedged beneath the passenger seat in the Defendant's car. Ms. Brown testified that the Defendant asked her to locate the can after it rolled in the car's backseat. A cell phone in the center console contained multiple incoming and outgoing text messages referencing methamphetamine transactions; the phone contained incoming messages from Mr. McCarty and others addressing a male recipient, circumstantially excluding Mr. McCarty and Ms. Brown as the phone's owner. The passenger compartment of the car also contained multiple small plastic bags and a digital scale, and the Defendant was carrying a large amount of cash on his person. Deputy Gagnon testified regarding drug-related slang in the text messages as well as the role of digital scales and plastic bags in drug transactions. Finally, in an attempt to save himself from arrest, the Defendant told Deputy Gagnon that he could assist the police in prosecuting important methamphetamine dealers, evincing a knowledge of the drug-selling community. The jury was instructed on constructive possession as well as joint possession. The evidence was sufficient for a rational juror to find that the Defendant had both physical control of the methamphetamine and an intent to exercise control over it. See State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (holding that constructive possession of cocaine was sufficiently proven when a bottle of cocaine was found in the front seat of the defendant's car, which he recently had been driving; a passenger testified that the defendant pulled the bottle from his pocket and threw it toward the passenger; the defendant walked away from the car shortly after a deputy stopped it; and the defendant appeared to be "extremely nervous" before and after he was asked for his driver's license). The Defendant is not entitled to relief on this basis.

Turning to the Defendant's remaining arguments regarding Ms. Brown and Mr. McCarty, they both bear on the witnesses' credibility. We have repeatedly stated that credibility determinations are the province of the finder of fact and will not be disturbed

on appeal. See Bland, 958 S.W.2d at 659. Ms. Brown and Mr. McCarty were questioned at some length regarding their respective plea agreements and their motivations in testifying, and trial counsel cross-examined them thoroughly about several discrepancies in their various self-serving statements. Trial counsel highlighted Ms. Brown's potential intoxication during his closing argument. The jury had ample evidence upon which to judge their credibility. The Defendant is not entitled to relief on this basis.

### III. Evidentiary Issues

The Defendant contends that the trial court abused its discretion by admitting the center console cell phone and corresponding text messages into evidence, arguing that (1) an insufficient foundation was laid to connect the phone and messages to him; (2) relative to Exhibits 18 and 19, which stated "I need four" and "need four now," respectively, an insufficient foundation was laid to establish that the messages referred to drug transactions; (3) relative to text message Exhibits 18, 19, Exhibit 26(b) and (c)—the portions of a message from Mr. McCarty in which he used coarse language and disparaged an ex-girlfriend—and Exhibit 33—the message from "Lola" warning the Defendant about an unknown person—the probative value of the messages was substantially outweighed by the risk of unfair prejudice; and (4) the incoming messages were inadmissible hearsay.

Before trial, the Defendant filed a motion in limine[12] arguing that text messages from the Defendant's cell phone were inadmissible. At the pretrial hearing on the motion, defense counsel argued, in relevant part, that the State lacked a sufficient foundation upon which to prove that the messages reflected conversations in which the Defendant participated; that the messages were prejudicial because they referenced prior drug transactions and alleged that the Defendant was a "drug dealer"; and that the probative value of the messages was substantially outweighed by the danger of unfair prejudice.

The State responded that that the text messages it sought to introduce came from the cell phone found in the Defendant's car at the time of his arrest and would be limited to those sent and received between October 4, 2016, at 10:30 p.m., and the time of the Defendant's arrest. The State argued that any messages sent by the Defendant were admissible as the statement of a party-opponent and that all of the messages were relevant to prove the Defendant's intent to sell or deliver the methamphetamine. The State noted that police testimony would lay a foundation to establish that the messages referenced drug

---

[12] The motion, any response from the State, and the written order from the trial court are not included in the record on appeal. However, upon review of the hearing transcript, the basis of the motion and the trial court's findings of fact and conclusions of law are sufficiently documented to enable our review.

transactions. The State also anticipated that Mr. McCarty would testify about sending some of the messages to the Defendant.[13]

The trial court noted that the written motion in limine raised only a hearsay issue; the court found that the "messages in the in-box" were not hearsay because they were not offered for their truth. Relative to the "out-box," the court found that so long as the State met its burden of proving that the cell phone belonged to the Defendant, the messages constituted admissions by the Defendant. The court found without further detail that the probative value of the messages was not outweighed by their prejudicial effect and denied the motion.

At trial, the Defendant objected several times to the admission of the cell phone found in the center console and the text messages on the basis of an inadequate foundation to prove that the phone or messages were his; he further objected to the admission of the incoming text messages as inadmissible hearsay.[14]

### a. Foundation/Probative Value

As a preliminary matter, the Defendant's appellate brief contains no citation to legal authority or a standard of review relative to foundation or authentication or the risk of unfair prejudice as compared to the evidence's probative value. "Issues which are not supported by . . . citation to authorities . . . will be treated as waived in this court." Tenn. R. Ct. Crim. App. 10(b). As a result, the Defendant has waived plenary review of this issue. We will, however, conduct plain error review.

The doctrine of plain error applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused must not have waived the issue for tactical reasons; and

---

[13] We note that at trial, Mr. McCarty's testimony was not consistent with the State's expectations in multiple respects, one of which was that he denied having sent the relevant text messages.

[14] The Defendant did not object at trial to the admission of the outgoing text messages on the basis of hearsay. He likewise does not raise this issue on appeal. We feel constrained to note that the Defendant's own statements were admissible under the party-opponent exception to the hearsay rule. See Tenn. R. Evid. 803(1.2)(A) (providing that "[a] statement offered against a party that is . . . the party's own statement in either an individual or representative capacity" is "not excluded by the hearsay rule").

-22-

(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231. Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." State v. Martin, 505 S.W.3d 492, 505 (Tenn. 2016).

At the outset, we note that "rarely will plain error review extend to an evidentiary issue." State v. Jonathan Mitchell Grimes, No. W2014-00786-CCA-R3-CD, 2015 WL 3929694, at *10 (Tenn. Crim. App. June 26, 2015) (quoting State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007)). Here, the Defendant is not entitled to relief because a clear and unequivocal rule of law was not breached.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible. Tenn. R. Evid. 402. However, it may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice[.]" Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)).

Relative to Exhibits 18 and 19, the Defendant argues that the messages lack any probative value because they are meaningless in isolation; simultaneously, he argues that the messages are "significantl[ly]" prejudicial when read "in combination with other messages that may have indicated drug transactions." By ignoring the context in which the messages occurred until it suits his purposes, the Defendant misses a crucial point— the messages' probative value lies in their meaning when read in context. The fact that the messages also have some inherent prejudicial effect does not make them unfairly prejudicial. The record reflects that the trial court acted within its discretion by finding that the probative value of the messages as a whole was not significantly outweighed by the risk of unfair prejudice.

Relative to Exhibit 26(b) and (c), although Mr. McCarty's personal problems did not bear on the Defendant's drug dealing activities, the beginning and end of the message

seeking to clarify the Defendant's articulated price for two ounces of drugs makes more sense in the context of the entire message, meandering though it may have been. The record does not reflect that the trial court abused its discretion by allowing the entire message to be admitted. We note that no request was made to redact any portion of the message. Similarly, we do not agree that any substantial risk of unfair prejudice inured to the Defendant as a result of receiving a message containing coarse language and a brief discussion of Mr. McCarty's animus toward a former romantic interest.

Relative to Exhibit 33, the Defendant contends that the implication that he associated with dangerous people and Lola's use of his middle name to identify him were "significantly prejudicial" and that the message lacked probative value because it did not directly mention a drug sale. Again, when read in the context of the other messages, it was reasonable for the jury to interpret Lola's statements as bearing on a drug-related transaction. The record does not reflect that the trial court abused its discretion by admitting it.

Moreover, Rule 901(a) of the Tennessee Rules of Evidence states as follows: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Evidence may be authenticated through testimony from a witness with knowledge that a matter is what it is claimed to be. Tenn. R. Evid. 901(b)(1). Authentication issues are left to the discretion of the trial court. State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (citing State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000)); State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)).

In this case, the cell phone and text messages were properly authenticated by Deputy Gagnon as the phone he found inside the Defendant's car and the messages he viewed on that phone. See State v. Justin Ray Lane, No. E2016-01756-CCA-R3-CD, 2017 WL 1449231, at *3 (Tenn. Crim. App. Apr. 24, 2017) (concluding that photographs of text messages were properly authenticated by a police witness, who identified the cell phone he used to communicate with the defendant's telephone number and affirmed that the photographs accurately depicted the text messages; this court also noted that the defendant had not provided any evidence to contradict the witness's testimony).

The Defendant's complaint relative to the adequacy of the evidence connecting him to the cell phone and text messages is an issue of the weight of the evidence, which was the province of the finder of fact at trial. The jury, by its verdict, determined that the cell phone belonged to the Defendant, and we will not disturb that finding on appeal. See Bland, 958 S.W.2d at 659.

Finally, we note that the Defendant makes a brief argument in this section of his appellate brief that all of the text messages were "needlessly" cumulative in light of the

-24-

other evidence at trial. The record reflects that no objection was made at trial or in the motion for a new trial on the basis of cumulative evidence, and any consideration of this issue has been waived. Tenn. R. App. P. 36(a).

In summary, the Defendant is not entitled to plain error relief on any of the evidentiary bases discussed above because a clear and unequivocal rule of law was not breached by the admission of the text messages. We note that consideration of these issues is also not necessary to do substantial justice; given that the bulk of the text messages were properly authenticated, any prejudicial effect of the specific messages identified by the Defendant would have been minimal and harmless.

### b. Hearsay

The Defendant contends that the incoming text messages did not establish ongoing drug transactions, thereby not complying with the State's expressed limited purpose for the messages at trial. Although he raises the propriety of all of the incoming messages, he only discusses in detail the message from Lola, which he argues does not directly reference drug sales; he states with some emphasis that Deputy Gagnon "offered no support" for the message.[15] The State summarily responds that the messages were not offered for their truth, without specifying the permissible purpose for which they were offered.

At the pretrial hearing, the State argued that the messages were offered to prove the Defendant's intent to sell the drugs found in his car. At trial, the State argued that the incoming messages were offered to establish that messages "indicative of drug transactions" were found on a cell phone in the Defendant's vicinity. The trial court agreed with the State that the messages were being offered "for this limited purpose."

"Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. The questions of whether a statement is hearsay or fits under one of the exceptions to the hearsay rule are questions of law and subject to de novo review by this court. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015), cert. denied, 136 S. Ct. 335 (2015).

We are constrained to agree with the Defendant that based upon the State's reasoning as articulated at trial, the incoming messages were hearsay and should have been

---

[15] We note that the portion of Deputy Gagnon's testimony to which the Defendant cites consists only of his reading the text message verbatim and confirming that the Defendant's middle name was "Lyn."

excluded. The "limited purpose" asserted by the prosecutor, that the State sought to prove that messages documenting an ongoing series of drug transactions were found on a cell phone in the car, relied on the messages' truth. The trial court abused its discretion by admitting the messages on this basis.

However, this error was harmless in light of the overwhelming evidence of the Defendant's intent—the presence of a digital scale and a quantity of small plastic bags in the car, his inculpatory statements made in the outgoing text messages, the large amount of cash he was carrying on his person, and his statement to Deputy Gagnon that he could help the police prosecute important methamphetamine dealers if he were not booked into jail. A rational juror could have concluded without reading the incoming text messages that the Defendant intended to sell methamphetamine. The Defendant is not entitled to relief on this basis.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE